Filed 10/13/15  P. v. Lightner CA2/5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>CRAIG LIGHTNER,<br><br>    Defendant and Appellant. | B261459<br><br>(Los Angeles County<br>Super. Ct. No. NA096896) |

APPEAL from a judgment of conviction of the Superior Court of the County of Los Angeles, Richard R. Romero, Judge.  Affirmed.

Kevin D. Sheehy, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Steven D. Matthews, Supervising Deputy Attorney General, Blythe J. Leszkay, Deputy Attorney General, for Plaintiff and Respondent.

# INTRODUCTION

Defendant and appellant Craig Lightner (defendant) appeals from that portion of the trial court's ruling denying his request to dismiss a prior strike conviction under *People v. Romero* (1996) 13 Cal.4th 497 (*Romero*). According to defendant, the trial court abused its discretion when it refused to dismiss the second and more recent of his two prior strike convictions because the current felony fell outside the spirit of the "Three Strikes" law, the prior strike conviction was not based on a heinous crime, and the trial court failed to consider defendant's cooperation with authorities as a mitigating factor in ruling on his *Romero* request.

We hold that the trial court relied on proper grounds and acted within its discretion in denying defendant's request to dismiss the second and more recent of his two prior strike convictions. We therefore affirm the judgment of conviction.

# FACTUAL BACKGROUND[1]

Defendant owned Cortes Tropical Marine Warehouse in Gardena, a business that imported and exported tropical fish. Among other tropical fish, he captured in the wild and sold blue banded gobis. On July 27, 2012, defendant and the victim, Mark Rascon, boarded defendant's boat in Avalon harbor and proceeded to a dive location off Santa Catalina Island between the isthmus and Avalon. Defendant, who knew it was illegal to capture blue banded gobis in the waters surrounding Santa Catalina, had agreed to pay the victim for each blue banded gobi[2] the victim captured while diving using a hookah

---

[1]    Because this appeal is from a judgment of conviction based on a plea agreement, the facts are taken from the preliminary hearing testimony.

[2]    Blue banded gobis congregate in rocky areas off Santa Catalina, in and around kelp beds at depths of 20 to 50 feet.

2

line system.[3] Recreational divers did not hookah line dive in the waters surrounding Santa Catalina because the presence of large amounts of kelp presented "an entanglement hazard for the hose" which could cause the regulator to be pulled from the diver's mouth.

The victim was an experienced free diver, but had no experience diving using a hookah line system or a regulator. Defendant gave the victim a "quick lesson" in hookah line diving by showing him how to fasten the hookah line to his weight belt and advising the victim that, if he became entangled in kelp, he should release the weight belt and make a free swimming ascent to the surface, blowing "bubbles on the way up." Defendant did not instruct the victim how to clear the regulator if it came out of his mouth under water or show him any hand signals to use to communicate while diving.

Defendant provided the hookah line diving equipment the victim used that day. Some of that equipment was unsafe for hookah line diving, including the mechanism that fastened the hookah line to the victim's weight belt.

Defendant and the victim made two or three dives on July 27. During the last dive, defendant observed the victim "below him, pushing kelp away." The victim was surrounded by, but not entangled in, kelp. Defendant's "hookah line was caught in the kelp," but he was able to use the anchor chain "to get back to the surface . . . ." Defendant used hand signals to alert the victim that defendant "was heading to the surface." Defendant began to ascend, leaving the victim at the bottom. Defendant looked back and saw the victim in 25 to 30 feet of water, surrounded by kelp, pushing it away. In an initial interview, defendant stated that was the last he saw of the victim until the victim surfaced. In a subsequent interview, however, defendant claimed that the victim began to surface with defendant, about ten feet to the left of defendant and about five feet below him. Defendant "went up underneath the boat, boarded the boat, and took off his wet suit immediately."

---

[3] A hookah line system supplies air to a submerged diver from a compressor on the surface through an attached hose with a regulator at the terminus of the hose that the diver inserts into his or her mouth.

After defendant finished rinsing his wetsuit, he saw the victim on the surface. Defendant heard the victim say "argh" or make a gurgling sound. The victim looked "'weird, stressed, and scared.'" The victim began swimming toward the boat, but "then went vertical, then onto his back, [then] started swimming away from the boat, [and] then eventually went under water." Defendant considered throwing a flotation cushion to the victim, but concluded that the cushion would not reach the victim due to the wind. Defendant did not jump into the water and attempt to rescue the victim because "he wasn't wearing his wetsuit and he was naked." Defendant thought about diving in and pulling off the victim's weight belt, but was concerned about "how [he was] going to get him up, [a] big guy like that."[4] When defendant reached down to put on his fins, he lost sight of the victim for 15 to 20 seconds. The next time defendant looked up, the victim was already five to seven feet under the water. At that point, defendant radioed the Coast Guard and reported a diver "missing."

When two Coast Guard rescue divers arrived at the dive location about 20 minutes later, defendant was on his cell phone, and the divers had difficulty getting his attention and determining the location where defendant had last seen the victim. Once defendant pointed out where he had last seen the victim, one of the rescue divers entered the water at that location and, "within less than 10 minutes," he surfaced with the victim. The other rescue diver then pulled the victim into the rescue boat by himself.

When he was brought to the surface, the victim was in full cardiac arrest. The rescue divers performed CPR and advanced life support for several minutes. As life saving efforts continued, the rescue divers transported the victim to a hyperbaric chamber at Avalon where he died.

An autopsy report concluded that the victim died of drowning caused by an air embolism. The victim also suffered "head and neck trauma" of unknown origin that did not contribute to his death.

---

**4**  The victim weighed around 230 pounds.

The investigating detective opined that the faulty equipment and inadequate training that defendant provided to the victim were factors that contributed to the victim's death.

Although defendant admitted having equipment for capturing blue banded gobis on board his boat the day of the incident and the victim sent his wife a picture of blue banded gobis in a bucket at around 12:47 p.m. that day, a subsequent search of the boat did not locate any equipment or fish.

Defendant had previously attempted to teach Daniel Castrillo to dive for blue banded gobis by advising him simply to "just breathe, don't hold your breath." Castrillo, who subsequently received formal SCUBA training, told defendant after the training that "diving without training can get you killed."

## PROCEDURAL BACKGROUND

In an information, the Los Angeles County District Attorney charged defendant in count 1 with involuntary manslaughter in violation of Penal Code[5] section 192, subdivision (b); in count 2 with taking, possessing, or landing blue banded gobi fish for marine aquaria pet trade purposes in violation of Fish and Game Code section 8598, subdivision (b)(1); and in count 3 with murder in violation of section 187, subdivision (a).

The District Attorney alleged as to count 1 that defendant had been convicted of two prior violent or serious felonies within the meaning of sections 667, subdivision (d) and 1170.12, subdivision (b); as to count 3 that defendant had been convicted of two prior serious or violent felonies within the meaning of section 667, subdivision (a)(1); and as to count 2 that defendant had served a prior prison term within the meaning of section 667.5, subdivision (b).

---

[5]     All further statutory references are to the Penal Code unless otherwise indicated.

5

Pursuant to a plea agreement, defendant pleaded guilty to count 1 and no contest to count 2, and the trial court dismissed count 3. Defendant admitted the two prior strike convictions and one prior conviction for which a prison term was served.

Prior to sentencing, defendant filed a *Romero* motion seeking dismissal of his two prior strike convictions. The trial court granted the *Romero* motion as to the older of the two prior strike convictions, but denied it as to the more recent conviction. Pursuant to the plea agreement, the trial court sentenced defendant to a low term sentence of two years on count 1, doubled to four years pursuant to the prior strike conviction. On count 2, the trial court sentenced defendant to a concurrent six-month term.

## DISCUSSION

### A.     Background

Pursuant to defendant's plea agreement, he filed, before sentencing, a motion to dismiss his two prior strike convictions. The first strike conviction defendant moved to dismiss involved a 1991 residential burglary conviction for violation of section 459. Defendant admitted breaking into his former roommate's apartment, taking three guns, and selling them on the street for $150 and a gram of cocaine. The second prior strike conviction that defendant moved to dismiss involved an October 2001[6] conviction for making criminal threats in violation of section 422. Defendant, who lived with his wife and child near an entry gate to the Fort MacArthur Air Force housing facility, left his house and approached a guard at the gate to the facility to complain about the noise generated by military buses seeking entrance to the facility by honking their horns. After complaining to the guard, defendant walked away and said, "The next vehicle that comes, I'm blowing it up." The guard believed the threat was credible under the circumstances.

At the hearing on the *Romero* motion, the trial court dismissed the earlier strike conviction for burglary, but denied the request to dismiss the 2001 strike conviction for

---

[6]     The incident took place about a month after 9/11.

6

making criminal threats. The trial court explained its ruling as follows: "The Court: In this matter, the court obviously has taken into account the different pleadings that were indicated, the statements made in open court. I do accept the representations that in his church and his community and with his family, he is an asset and has been a positive influence to others and is well-respected there. [¶] He does have, though, a lengthy criminal record. The residential burglary is fairly dated, from 1991. All residential burglaries have some potential violence, but this would be a less serious kind of residential burglary. [¶] The 422 criminal threats case is a different type entirely. A threat of violence is akin to violence itself. The victim took it seriously, feared retribution against him. [¶] In this case, as counsel pointed out, it is not an intentional killing. It's involuntary manslaughter. So I am not dealing with violence in the traditional sense. What we're dealing with here is a life-endangering state of mind, not an intent to kill, but a life-endangering state of mind. And that was demonstrated in the past by the criminal threats, by the statement of the prior diver that [defendant's] activities were dangerous and someone was going to be killed, and yet [defendant] persisted in these matters, brought an untrained diver to dive without experience, showed callousness in turning off the air and being more concerned with the air than with the diver's life, did not take measures to pull him out of the water, was on the phone, had to be directed three times or so to bring his attention to the lifeguards, and took time to get rid of the evidence of illegal fishing, did not have a permit. [¶] So the end result of all this is that taking into account [defendant's] conduct in this case for involuntary manslaughter, the callousness that was shown before, during, and after the death, his long criminal record, and in mitigation the positive things in his life, I am dismissing only one strike, the residential burglary, but not the 422 because that does demonstrate the same kind of life-endangering state of mind."

## B. Standard of Review

We review a trial court's ruling denying a request to dismiss a prior strike conviction under an abuse of discretion standard. (*People v. Carmony* (2004) 33 Cal.4th

7

367, 376.) "In reviewing for abuse of discretion, we are guided by two fundamental precepts. First, '"[t]he burden is on the party attacking the sentence to clearly show that the sentencing decision was irrational or arbitrary. [Citation.] In the absence of such a showing, the trial court is presumed to have acted to achieve legitimate sentencing objectives, and its discretionary determination to impose a particular sentence will not be set aside on review."' (*People v. Superior Court* (*Alvarez*) (1997) 14 Cal.4th 968, 977-978 [60 Cal.Rptr.2d 93, 928 P.2d 1171] (*Alvarez*), quoting *People v. Superior Court* (*Du*) (1992) 5 Cal.App.4th 822, 831 [7 Cal.Rptr.2d 177].) Second, a '"decision will not be reversed merely because reasonable people might disagree. 'An appellate tribunal is neither authorized nor warranted in substituting its judgment for the judgment of the trial judge.'"' (*Alvarez*, at p. 978, quoting *People v. Preyer* (1985) 164 Cal.App.3d 568, 573 [210 Cal.Rptr. 807].) Taken together, these precepts establish that a trial court does not abuse its discretion unless its decision is so irrational or arbitrary that no reasonable person could agree with it. [¶] Because 'all discretionary authority is contextual' (*Alvarez*, *supra*, 14 Cal.4th at p. 978), we cannot determine whether a trial court has acted irrationally or arbitrarily in refusing to strike a prior conviction allegation without considering the legal principles and policies that should have guided the court's actions." (*Id.* at pp. 376-377.)

### C.    Legal Principles and Policies

In *People v. Vargas* (2014) 59 Cal.4th 635, 641, the Supreme Court recently reiterated the purpose of the Three Strikes law and provided guidance to trial courts faced with ruling on motions to dismiss a strike conviction under section 1385.[7] "Given the intent of both the Legislature and the drafters of the initiative version of the Three Strikes

---

[7]    Section 1385 provides, in pertinent part: "(a) The judge or magistrate may, either of his or her own motion or upon the application of the prosecuting attorney, and in furtherance of justice, order an action to be dismissed. The reasons for the dismissal shall be stated orally on the record. The court shall also set forth the reasons in an order entered upon the minutes if requested by either party or in any case in which the proceedings are not being recorded electronically or reported by a court reporter. . . ."

law to punish repeat criminal offenders severely, to drastically curtail a sentencing court's ability to reduce the severity of a sentence by eliminating alternatives to prison incarceration, and to limit an offender's ability to reduce his or her sentence by earning credits, a question arose soon after enactment of the parallel Three Strikes schemes whether a trial court retained its traditional authority under section 1385 to dismiss an enhancement 'in furtherance of justice.' (Fn. omitted.) We settled the issue in *People v. Superior Court* (*Romero*) (1996) 13 Cal.4th 497, 529-530 [53 Cal.Rptr.2d 789, 917 P.2d 628] (*Romero*), where we concluded 'that section 1385[, subdivision ](a) does permit a court acting on its own motion to strike prior felony conviction allegations in cases brought under the Three Strikes law.' [¶] In order to guide the lower courts when ruling on such motions to dismiss, *People v. Williams* (1998) 17 Cal.4th 148, 161 [69 Cal.Rptr.2d 917, 948 P.2d 429], explained that when facing a motion to dismiss a strike allegation, the trial court 'must consider whether, in light of *the nature and circumstances* of [the defendant's] present felonies and prior serious and/or violent felony convictions, and the particulars of [the defendant's] background, character, and prospects, *the defendant may be deemed outside the scheme's spirit*, in whole or in part, and hence should be treated as though he had not previously been convicted of one or more serious and/or violent felonies.' (Italics added.) We quoted this language with approval in *People v. Carmony*[, *supra,*] 33 Cal.4th [at p.] 377, and further explained that '[b]ecause the circumstances must be "extraordinary . . . by which a career criminal can be deemed to fall outside the spirit of the very scheme within which he squarely falls once he commits a strike as part of a long and continuous criminal record, the continuation of which the law was meant to attack" [citation], the circumstances where no reasonable people could disagree that the criminal falls outside the spirit of the three strikes scheme must be even more extraordinary.' (*Id.* at p. 378.)"

## D. Analysis

Defendant contends that the trial court abused its discretion because the nature and circumstances of his current offense fell outside the spirit of the Three Strikes law.

9

According to defendant, the testimony and evidence presented at the preliminary hearing showed, at most, negligent acts of omission on defendant's part, but not intentional or reckless conduct. We disagree.

The nature and circumstances of the victim's death show that defendant invited the victim to assist him in capturing blue banded gobis off Santa Catalina, knowing that such activity in those waters was illegal. Defendant also knew the victim had no experience with hookah line diving, but nevertheless took the victim to a location where recreational line divers did not hookah line dive due to the large amount of kelp and the entanglement hazard. Defendant then provided inadequate training and equipment to the victim.

On the last dive of the day, defendant saw the inexperienced, poorly trained and equipped victim surrounded by kelp, trying to push it away. At that point, defendant himself became entangled in kelp. To extricate himself, defendant used the anchor chain to ascend, leaving the victim alone on the bottom surrounded by kelp, a selfish and callous act.

Showing no concern or regard for the victim's safety or well being, defendant, upon reaching the surface, immediately changed out of his wetsuit and dive gear. When the victim surfaced in obvious distress, defendant did not throw him a flotation cushion or make any other effort to assist the victim. Instead, he waited until the victim was five to seven feet under the surface to call the Coast Guard and report that the victim was "missing." When the Coast Guard arrived, defendant was preoccupied on his cell phone, conduct which delayed the entry of the rescue diver into the water and again appeared selfish. Defendant also took the time, before the Coast Guard arrived, to dispose of the fishing equipment that he admitted was on board that day. This self-serving conduct, under the grave circumstances, reflected poorly on defendant.

Given the evidence, it was not unreasonable for the trial court to conclude that defendant's conduct on the day in question went beyond mere negligence and evinced a callous and reckless frame of mind. Therefore, the trial court did not abuse its discretion in concluding that defendant's current offense did not fall outside the spirit of the Three Strikes law.

Defendant next contends that the nature and circumstances of his prior strike conviction for making criminal threats also fell outside the spirit of the Three Strikes law. He argues that his conviction may have technically qualified as a strike, but that it amounted to no more than "venting anger and frustration."

The prior strike conviction was based on defendant's express threat to blow up a military bus, made to a military guard who was on duty. The circumstances of the threat, including that it was made at a military base just after 9/11, were such that the guard, an Air Force lieutenant, believed it to be credible. Thus, the trial court did not abuse its discretion by concluding that the nature and circumstances of the prior conviction showed a life endangering state of mind.

Defendant also maintains that the trial court did not consider defendant's cooperation with authorities as a mitigating factor, and therefore abused its discretion. As defendant reads the plea agreement, the parties thereto contemplated that if defendant cooperated with the authorities, the trial court would be required to weigh that mitigating fact when determining defendant's *Romero* motion.

Contrary to defendant's assertion, the record of the hearing on the *Romero* motion shows that the trial court was aware of defendant's mitigation evidence and considered it when ruling on the motion. The trial court expressly accepted that defendant was "an asset" and a "positive influence" in the community, and the court considered those characteristics as mitigating factors. Moreover, although the plea agreement recited that defendant's cooperation with authorities in connection with an investigation on narcotics trafficking would be a ground for a continuance of his sentencing, it neither stated nor implied that such cooperation, by itself, would warrant the granting of defendant's *Romero* motion. Accordingly, the trial court did not abuse its discretion with respect to the evidence of defendant's cooperation with authorities and its consideration of mitigating factors.

## DISPOSITION

The judgment of conviction is affirmed.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS


MOSK, Acting P. J.

We concur:


KRIEGLER, J.


BAKER, J.

12